UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 OCT -5 P 3:17

UNITED STATES OF AMERICA )
)
)    Crim. No. 04-00471-JLT
v. )
)
DAVID LAFLEUR )
)
)

U.S. DISTRICT COURT
DISTRICT OF MASS.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DAVID LAFLEUR'S MOTION TO DISMISS THE INDICTMENT

David Lafleur ("the defendant"), by and through undersigned counsel, hereby moves this Honorable Court for an order dismissing the indictment issued against him by a Grand Jury on May 19, 2004. The indictment charges the defendant with Grand Jury perjury and obstruction of justice following his testimony before the same Grand Jury that indicted him. The defendant contends that the court must order the dismissal of this indictment for three reasons. First, the government violated the defendant's due process rights by informing him and leading him to believe that he was a witness who could help the government's investigation into the possible racketeering activities of the Timothy Mello crime syndicate operating in the New Bedford/Fall River area. Contrary to the government's misrepresentations to the defendant and his attorney, the defendant was an actual target of the Grand Jury probe. The prosecution tricked the defendant into testifying before the Grand Jury and engaged in prosecutorial misconduct by coaxing him to appear before a Grand Jury for the sole purpose of entrapping him.

The second reason warranting dismissal of the indictment stems from the government's violation of the defendant's Fifth Amendment rights by intentionally

withholding exculpatory evidence from the Grand Jury. The defendant contends that the government withheld testimony from key police witnesses who would have directly refuted the questionable testimony of the government's two cooperating convicted criminal witnesses and would have provided substantial evidence negating Lafleur's guilt. Finally, the court must dismiss this indictment because the government's actions as a whole constitute outrageous government conduct and offend principles of fundamental fairness enshrined in the United States Constitution.

## STATEMENT OF FACTS[1]

David Lafleur ("the defendant") is a thirty-seven year old father of two young children ages two and five. A life-long resident of Fall River, Massachusetts and a graduate of Fall River's Durfee High School, Lafleur has served as a Uniformed Patrolman for the Fall River Police Department ("FRPD") since 1988. While serving as a Patrolman, the defendant also worked in several other units inside the FRPD, including Vice/Narcotics.

In or around early January, 2002, the defendant received a telephone call from his elderly father who told him that FBI agents had tried to serve papers on him at his parents' home at 139 Smithies Street in Fall River. When the defendant asked what this was about, his father replied, "I don't know but your mother's upset. They said you're a witness in this case and they want to serve you with a subpoena."

The defendant immediately proceeded to his parent's house, where he observed his mother in tears. After obtaining from his father the pager number of Bristol County

---

[1] The affidavit of David Lafleur, attached as Exhibit A, serves as the basis for the defendant's Statement of Facts unless otherwise indicated.

Deputy Sheriff John "Jack" O'Neil ("O'Neil"), one of the government agents trying to serve the subpoena, the defendant paged him. When O'Neil returned his call, the defendant complained about the fact that rather than serving him at his own home, O'Neil instead darkened the door of the defendant's parent's residence, intimidated them, and made his mother cry.

O'Neil apologized. The Bristol County Deputy Sheriff then stated that because he did not know where the defendant lived, he had performed license and social security checks on him. Supposedly, these background checks produced the address of the defendant's parents' house. O'Neil said he decided to go there to try to serve the subpoena.

O'Neil insisted that he needed to serve the defendant personally with the "subject paperwork." When the defendant asked O'Neil to explain himself further, the government agent replied that he could not tell him over the telephone. O'Neil informed the defendant of the necessity of a "face to face" meeting. The defendant answered, "If you want to meet me, meet me at the Police Station because I want a witness. You can serve me in front of my Lieutenant." O'Neil replied that he did not want to meet the defendant at the Fall River Police Station because he did not "want to embarrass [him]." The defendant responded, "No, you don't want to embarrass yourself because you're on a fishing expedition and harassing people."

O'Neil then stated, "It's just for a witness only. It's just for paperwork. You got to go up there and answer some questions. It's not a big deal." Angered by O'Neil's response, the Defendant hung up the telephone. The defendant, however, called O'Neil back immediately and said [in essence], "It's me again. I'll just meet you somewhere.

3

defendant replied, "You're bothering the wrong person. I'm a good person from a good family." O'Neil answered "I know you are, but your name's coming up in this."

The defendant eventually agreed to sit in the unmarked police car with O'Neil and Neto. The Defendant and O'Neil spoke for about fifteen to twenty minutes, and Neto remained silent throughout their conversation. During the conversation, O'Neil again said [in essence], "Don't be nervous. You're just going to answer some questions. You've been to court before. You know the routine with subpoenas."

The defendant eventually took the Federal Grand Jury Subpoena from O'Neil. He noted that it said "Witness." O'Neil and Neto then left in their unmarked police car. The defendant, meanwhile, proceeded to the FRPD and immediately informed the Lieutenant on duty, Paul Matos ("Matos"), that the government had subpoenaed him to testify before a grand jury. The defendant asked Matos if he thought their Chief should know about it.[3]

Matos immediately called FRPD Chief John Souza ("Souza"), who agreed to return to the police station that night. Once Souza arrived, Matos, the defendant and the defendant's Union President, Sgt. Andrew Joseph, went to Souza's office. Souza thanked the defendant for his honesty and candor regarding the subpoena. Souza also revealed to the defendant that on a date prior to that night, O'Neil had approached him at the FRPD headquarters. Souza said that O'Neil requested a private meeting with him. When the two were alone, Souza recalled, O'Neil told him the defendant was "shaking down drug dealers, stealing their money, and donating their money to charities." He accused Souza of "not doing anything about [this corrupt activity]." Souza was outraged by both the

---

[3] FRPD internal policy requires officers served with out of town, or out of state, subpoenas to notify the Department.

allegations, and the manner in which O'Neil presented them. Souza asked O'Neil to leave his station.

On or about the day following his service with the Grand Jury Subpoena, the defendant contacted Attorney Kenneth Fredette ("Fredette") of Fall River. The defendant had known Fredette from Fredette's days as a local prosecutor with the Bristol County District Attorney's Office. The defendant asked Fredette to represent him in connection with the subpoena he had received from O'Neil. Fredette, in turn, contacted Assistant United States Attorney Brian Kelly ("Kelly"). Fredette had spoken with Kelly earlier regarding an unrelated witness in the same Grand Jury proceedings.

Kelly informed Fredette his investigators wanted to speak with the defendant and question him about persons targeted by the Grand Jury. Kelly neither stated, nor implied to Fredette in Fredette's capacity as counsel of record, that the defendant was a target of the Grand Jury before which he was being called to testify or of the underlying criminal investigation.

On January 16, 2002, the defendant and Fredette traveled to Boston to meet with Kelly, O'Neil, Neto, and several unidentified government agents. The meeting occurred at the Office of the United States Attorney. During the meeting, Kelly questioned the defendant about statements he had purportedly made to other Fall River Police Officers regarding his relationship with Mello. The defendant admitted he had boasted about a relationship with Mello that did not exist.

The defendant explained that he routinely says "hello" to Mello whenever their paths cross and that, several months prior, both he and Mello had attended the same wedding. At no time during this meeting did any of the government agents confront the

6

defendant with, or ask him about, evidence suggesting that he provided tips and information to Mello. At no time during this meeting did any of the government agents suggest to the defendant they suspected that the defendant had acted inappropriately in connection with a search warrant he helped execute during his FRPD Drug/Vice Unit assignment in September of 1992.

Kelly did ask the defendant a number of questions about his knowledge of his cousin Schieri's business relationship with Mello.[4] Kelly only asked the defendant information-gathering questions. Within the context of those questions, Kelly and O'Neil suggested that the defendant try to speak privately with Schieri to try to persuade him to cooperate with their related grand jury investigation. They also asked the defendant to deliver a standard proffer letter to Schieri.

Sensing that this particular request had upset his client, Fredette asked Kelly if he could immediately meet with him and the investigators outside the defendant's presence. (Fredette Affidavit, attached as Exhibit B). Kelly accommodated this request, and Fredette explained why he thought it would be impossible for his client to approach Schieri, the defendant's second cousin, at the direction of federal agents. Instead, Fredette proposed that Kelly address an appropriate proffer letter to him, which he would,

---

[4] Schieri is the Defendant's second cousin. The same Grand Jury indicted Schieri as a co-conspirator in the Mello case, and he has since pled guilty. He eventually provided Grand Jury testimony against the defendant. Schieri received a reduced jail sentence pursuant to a "Substantial Assistance Motion", see United States Sentencing Guidelines Manual § 5K1.1, filed by the government as a result of his cooperation against the defendant. Despite his indictment as a co-conspirator in a racketeering enterprise and his admission that he distributed cocaine for the Mello crime syndicate, Schieri received a sentenced of only one year in prison as a result of his cooperation. By contrast, upon conviction, the defendant would face a sentence possibly in excess of two years under the Federal Sentencing Guidelines.

in turn, present to Schieri. (Id.) Kelly provided Fredette with the requested letter and adjourned the meeting.

Through the conclusion of the January 16, 2002, meeting, the government never informed Fredette that his client was an actual target of the on-going Mello grand jury investigation. (Id.) The government also never informed Fredette that it knew about any acts, deeds, or allegations relating to his client involving criminal activity. (Id.) If the government had notified Fredette about its suspicion and his client's designated target status, he would have requested the same type of immunity that the government had offered for the defendant's cousin that same day. (Id.) Moreover, as the meeting concluded, one of the unidentified federal agents placed his hand on the defendant's shoulder and privately stated to him, "Don't worry. I think you're just guilty of association. Just be careful of who you're hanging around with."

Approximately one month later, on February 7, 2002, the defendant appeared before the Grand Jury convened to investigate Mello and his criminal organization. At the time of his client's grand jury appearance, the government still failed to inform Fredette that the defendant was a target of the same Grand Jury before which he had been subpoenaed to testify. (Id.) If the government had informed Fredette, he assuredly would not have permitted his client's testimony. (Id.)

Unaware of the government's true intentions, the defendant testified before the Grand Jury. Kelly began the session by asking the defendant routine questions about his background and whether or not he knew Mello. Then, Kelly pointedly asked the defendant if he "participated in a search warrant back in 1992 where [Mello] was present." (Lafleur Grand Jury Transcript at 6, attached as Exhibit C.) Kelly also asked

the defendant if Frank "Bruno" Moniz[5] ("Moniz") was present during that search. (Id.) After several more questions, Kelly asked the defendant "[w]hy wasn't he [Mello] arrested for the drugs?" (Id.) The Defendant answered, "Because...the older gentleman had the drugs." (Id.)

Kelly asked more questions about the 1992 search before asking some general questions about Moniz and Schieri. Abruptly, Kelly switched his focus back to Mello and asked the defendant, "Did he [Mello] ever ask you about this Grand Jury Investigation?" (Id. at 9.) The defendant answered "no", and Kelly then asked him a series of questions regarding how he [the defendant] knew Mello and what he knew about him. (Id.) Kelly also asked the defendant whether or not he knew about Schieri's alleged drug activity. (Id. at 11.)

Eventually, Kelly returned to the topic of Mello. This time, however, his questions were even more direct. First, he asked the defendant "[d]id you ever do any favors for Mello?" (Id. at 13.) He followed that question with, "[d]id you ever run any license plates for Mello?" (Id.) After that he asked, "[d]id you ever run any license plates for people connected to Mello?" (Id.)

Even though the defendant provided negative responses to each of these questions, Kelly continued to press him. Kelly next asked, "[did] you ever find out about investigations for Mello?" (Id. at 14.) When the defendant replied, "Never, no", Kelly asked "[d]id you ever give [Mello] a heads up that cops are looking at him in various areas?" (Id.) Kelly then asked, "Ever tell Mello about any informants - -". (Id.)

---

[5]The government indicted Moniz as Mello's co-conspirator. Prosecutors described him as Mello's Lieutenant.

During this pointed colloquy in which Kelly asked six straight questions indicating that the government suspected the defendant of criminal involvement with Mello and his crime syndicate, the government not once reminded the defendant about his Fifth Amendment privilege against self-incrimination. Moreover, the government failed to inform him then, or ever, it regarded the defendant as a target of the Grand Jury's investigation. Kelly also failed to reiterate, when he asked these six pointed questions, that the defendant had the right to excuse himself from the Grand Jury Room in order to consult with his attorney.

Kelly moved on to a series of questions regarding the FRPD. Once again, he returned to the subject of Mello and said, "Okay. And I'm asking you again. Have you ever done any favors for Mr. Mello in the past?" (Id. at 17.) The defendant replied, "Absolutely not." (Id.)

Two years later, on February 12, 2004, Mello testified before the same Grand Jury pursuant to the terms of a plea agreement he had executed with the United States Attorney. In the course of his testimony, Kelly asked Mello questions about the same 1992 search warrant about which he had questioned the defendant on February 7, 2002. Amongst other related questions, Kelly asked Mello "so what happens when they [the FRPD] come in?" (Mello Grand Jury Transcript at 109, attached as Exhibit D.) Mello answered, "As soon as they come in and they start searching, Dave Lafleur immediately starts talking to Charlie Freitas who, I think Charlie was the sergeant or in charge of this investigation, and starts asking him to let me go. He's saying, let Mello and—he knows my relationship with Frankie, let Mello and Moniz go." (Id. at 110.) Mello also told the Grand Jury, "...So I, in turn, call David Lafleur over, and I tell David that he has, if he

could grab this package..." (Id.) Further on in his narrative about the execution of the 1992 search warrant Mello testified, "David [the defendant] kept lobbying Freitas to let us go, let us go." (Id. at 111.) He also claimed he saw the defendant "grab the stuff off the TV." When asked by Kelly to explain his testimony in more detail, Mello stated, "...I told David Lafleur that there's something on the TV. He went and took it off of the television and put it in his pocket, but, apparently, when he took it off the television, he knocked something over, and it might have been loose packages next to it or, or, or maybe Joe did it earlier in the night, but there was a small package behind the television." (Id. at 113.) Kelly then asked Mello, "Okay. And as a result of this event in Hayes' apartment, do you meet again with Lafleur and discuss it?" (Id.) Mello replied, "Yeah. The next day, I gave him $1,500 that I got from Joe."[6] (Id.) Later, also during Mello's appearance before the same Grand Jury that had heard Kelly question the defendant about the 1992 search warrant and "doing favors" for Mello two years prior, Kelly asked Mello, "So, in addition to this occasion where you paid him $1,500, there were other occasions when you paid Lafleur cash?" (Id. at 115.) Mello answered "yes." (Id.) He went on to claim to the Grand Jury that the defendant had tipped him off about a trap and a trace device attached to a telephone used by Moniz. Mello testified he gave the defendant "a few hundred dollars" in exchange for that information. (Id. at 118.) To clarify, Kelly asked, "So he was, basically doing you a favor, and you paid him?" (Id. at 119.) The word favor was the same term Kelly used when he questioned the defendant before the same Grand Jury on February 7, 2002. (Lafleur Grand Jury Transcript at 13.)

---

[6] When cooperating witness Vincent Schieri testified before the same Grand Jury, he claimed that he saw Mello pay the defendant $1500.00 the day after the 1992 raid.

Several questions later, Kelly asked Mello, "Getting back to Lafleur, okay, you make a payment to Lafleur as a result of this '92 search warrant, you make a payment to him in the late nineties when he tips you off about this trap and trace device. Are there any other payments to Officer Lafleur in between?" (Mello Grand Jury Transcript at 121.)   In response, Mello testified that the defendant alerted him about the Drug Enforcement Agency ("DEA") approaching him [the defendant] in hopes that he would wear a wire against Mello. (Id. at 121-22.) Kelly then stated, "So that's another occasion he gave you confidential information?" (Id. at 122.) Two years earlier, in front of the same Grand Jury, Kelly had asked the Defendant if he had "[sic] found out about investigations" for Mello. (Lafleur Grand Jury Transcript at 14.)

Kelly also asked Mello, "And in approximately 1997, did he [the Defendant] ever tell you something about a guy named Mike Goyette?" (Mello Grand Jury Transcript at 122.)   Mello replied, "Yeah. He said that Mike Goyette had been arrested, and Jack O'Neil was asking him questions about me or, or something to that effect, questioning in regards to me." (Id.) Kelly responded, "So, basically, he gave you information about someone who might be cooperating with law enforcement?" (Id.) Two years before, in front of the same Grand Jury, Kelly had asked the defendant, "Ever tell Mello about any informants?" (Lafleur Grand Jury Transcript at 14.)

Kelly also asked Mello if the defendant had ever run any license plates for him. Mello replied "…I know that he's run plates for me. I just, I, don't remember which plates…And there were other instances." (Mello Grand Jury Transcript at 125.) When questioned by Kelly in 2002 in front of the same Grand Jury, Kelly directly asked the defendant "did you ever run license plates for Mello?" (Lafleur Grand Jury Transcript at

13.) Kelly also asked the Defendant in 2002 whether he knew whether Schieri, his cousin, stored drugs for Mello. (Id. at 11.) Two years later, Kelly asked Mello in front of the same Grand Jury, "Was he [the defendant] aware that his cousin, Vinny Schieri, was storing drugs for you?" (Mello Grand Jury Transcript at 126.) Kelly also asked Mello, "And you let him [the defendant] know you had a little drug business going?" (Id. at 127.) Mello answered "yes" and Kelly stated, "And you let him know that his cousin, Vinny Schieri, was helping you?" (Id.) Mello responded, "Yes." (Id.)

Approximately three months after the government presented Mello as a witness, Bristol County Deputy Sheriff Jack O'Neil testified before the same Grand Jury. O'Neil essentially buttressed the testimony of Mello and Schieri. O'Neil, however, provided testimony to the Grand Jury that unequivocally revealed that the government considered the defendant as a target of the Mello crime syndicate investigation at the time the defendant appeared before the Grand Jury in February of 2002. The government asked O'Neil, "[W]as it important or material to the Grand Jury and your investigation at the time [February of 2002] that it be (sic) determined whether any law enforcement officer, including Mr. Lafleur, was providing law enforcement information to Timothy Mello or his criminal associates?" (O'Neil Grand Jury Transcript at 14, attached as Exhibit E.) O'Neil replied, "Yes sir." (Id.) The government then asked O'Neil whether it was "important to the investigation at the time whether any police officers, including Mr. Lafleur, had received any payoffs in the form of cash or any other things of value from Timothy Mello or the criminal organization at the time?" (Id. at 14-15.) O'Neil again responded, "Yes sir." (Id. at 15.) Finally, the government asked O'Neil whether it was "important to the investigation whether or not Mr. Lafleur, or any other police officer,

was receiving payments of things of value from Timothy Mello and his criminal associates in exchange for helping Mr. Mello or his associates avoid getting arrested?" O'Neil again provided a sycophantic "Yes, sir." (Id. at 15.)

The Grand Jury indicted the defendant based solely on the testimony of the two coopering witnesses, Schieri and Mello. The government tried to buttress that testimony with the statements of Deputy Sheriff O'Neil.   Much of Mello's and Schieri's cooperation related to their non-corroborated claim that Mello provided the defendant with an illicit payoff in exchange for the defendant cutting Mello loose during the execution of the search warrant in 1992.  Nonetheless, despite knowing that Fall River Police Officer Bruce McCabe possessed exculpatory evidence that would have refuted the cooperator's stories and negated the flimsy evidence of the defendant's guilt in that regard, the government declined to call him as a witness.

It is beyond dispute that Officer McCabe possessed exculpatory information about the 1992 raid of Joseph Hays' apartment.  During an FRPD internal affairs investigative interview conducted after the defendant's indictment, Officer McCabe told internal affairs that he did not arrest Timothy Mello during the raid in 1992 "[b]ecause there was no proximity to the drugs." (FRPD Internal Affairs Interview of Officer McCabe at 2, attached as Exhibit F.) McCabe also denied that he or any other police officer including the defendant ever took money from Timothy Mello. (Id. at 3.) When asked to expound on the government's theory of the case, McCabe replied, "That's the biggest crock of shit I've ever heard in all my 'fuckin' entire life, my fifty-seven years of life. You know, the biggest crock of shit and whoever they are hanging their 'fuckin' hat on, for those kind of 'fuckin' statements, I really and truly don't 'fuckin' know . . . I don't know what their

14

'fuckin' angle is and how they paint people with a broad 'fuckin' brush or put him in such a 'fuckin' stink or a 'fuckin' you know, its' 'fuckin' absurd. It really and 'fuckin' truly is. They put a stink on 'fuckin' people . . . For them to allege that 'fuckin' happen (sic) or whoever is feeding them full of 'fuckin' full or 'fuckin' horseshit, you know, it's beyond 'fuckin' belief. It really and truly is." (Id. at 6-7.)

The government did call Fall River Police Officer Charles Freitas to testify as a witness before the Grand Jury. Despite knowing that Freitas also possessed evidence that would have negated the defendant's guilt, the government prevented Freitas from refuting the cooperating witnesses' stories. Specifically, Officer Freitas told a FRPD internal affairs investigator that he and the defendant did not arrest Mello because they saw Joseph Hays toss the cocaine. Officer Freitas told internal affairs that he informed the government of his version of events just prior to his testimony before the Grand Jury. (FRPD Internal Affairs Interview of Officer Charles Freitas at 3, attached as Exhibit G)("Mr. O'Neil ended up somewhat jumping up and making accusations that it is common knowledge that the Fall River Police Department has a lot of dirty cops and my response was I thought he was out of line. He again then – they went back to the report, asking questions concerning Timmy Mello being present at that search warrant and was it true that Timmy Mello was the one that actually threw the coke down, that we saw that take place and that it was Timmy Mello's coke and not Joe Hays' coke. And I said, 'Absolutely not, it was Joe Hays' cocaine.' And it was observed in the apartment, he had made a motion to indicate where it was"). Moreover, Freitas told internal affairs that contrary to Mello's testimony before the Grand Jury, Mello remained silent during the raid in 1992. (Id. at 10.) Freitas also told internal affairs that the defendant's account of

15

the raid in 1992 was essentially accurate. (Id. at 11.) (Lt. Rodrigues: "Is there anything in [the defendant's account of the raid] that would be terribly incorrect?" Off. Freitas: "No.") The government, however, never asked Freitas specific details about the arrest of Hays, never questioned him abut non-corroborated aspects of Mello's related testimony, never sought Freitas's opinion on the accuracy of the defendant's prior statements to the Grand Jury, and declined to ask the crucial question of why the FRPD chose not to arrest Mello during the raid of Joseph Hays' apartment in 1992. Without any testimony from non-cooperating witnesses who would have cast doubt upon the veracity of Schieri and Mello, the Grand Jury returned an indictment against the defendant on May 19, 2004.

## ARGUMENT

### A. The Government Violated Lafleur's Due Process Rights By Falsely Suggesting He Was Not A Target Of The Grand Jury's Investigation

The government committed an egregious violation of Officer David Lafleur's due process rights when it lured him into appearing before a Grand Jury under false pretenses. Specifically, the government misleadingly told the defendant that it sought his testimony as a mere witness at the Grand Jury proceedings when, in fact, he was actually a target of the Grand Jury's investigation. While the United States Supreme Court has explicitly held that witnesses are not constitutionally entitled to "target" warnings, United States v. Washington, 431 U.S. 181, 186 (1977), the government impinges upon principles of fundamental fairness when it affirmatively misleads a defendant about his status as a target. United States v. Babb, 807 F.2d 272, 277-78 (1st Cir. 1986). A target is "a person as to whom the prosecutor or the grand jury has substantial evidence linking him/her to the commission of a crime and who, in the judgment of the prosecutor, is a putative

defendant." <u>United States v. Three Juveniles</u>, 886 F.Supp. 934, 941 (D. Mass. 1995)(quoting United States Attorney's Manual § 9-11.150)(internal quotations omitted).

Despite the absence of a constitutional requirement to inform witnesses about their status as a grand jury target, the United States Department of Justice adheres to a "longstanding internal practice [of] advis[ing] witnesses who are known targets of the investigation that their conduct is being investigated for possible violations of federal criminal law." <u>United States v. Pacheco-Ortiz</u>, 889 F.2d 301, 308 (1st Cir. 1989)(quoting United States Attorney's Manual § 9-11.150)(internal quotations omitted). The government's unjustified decision to deviate from its own internal practices may constitute grounds for dismissal of an indictment. In <u>United States v. Jacobs</u>, 547 F.2d 772, 778 (2d Cir. 1976), the Second Circuit exercised its supervisory power and dismissed a perjury indictment where the government failed to inform a witness that he was actually the target of the grand jury's investigation. Recognizing the need for consistent governmental practices, the <u>Jacobs</u> Court dismissed the indictment to prohibit unjustified disparate treatment by law enforcement. <u>Id.</u>

Examining the <u>Jacobs</u> decision, the First Circuit has held that it will exercise its supervisory powers and dismiss an indictment only when the indictment at issue is the product of manifestly improper conduct by governmental officials. <u>Pacheco-Ortiz</u>, 889 F.2d at 310. The operative question is whether the decision to indict a defendant "was influenced in any manner by the failure to give [target] warnings." <u>Id.</u>

Here, the indictment stems from the government's decision to trick the defendant into believing he was a witness when in fact he was a target of the investigation. Prior to his appearance before the Grand Jury, the government repeatedly misled the defendant into

17

believing that he was not a target of the Grand Jury proceedings. When the government's lead agent, Bristol County Deputy Sheriff Jack O'Neil, initially approached the defendant about testifying before the Grand Jury, he stated that he needed the defendant as a witness to help in the government's investigation of the Mello crime syndicate. O'Neil, however, knew that the defendant was actually a target of the government's investigation into the Timothy Mello crime syndicate or, at least, considered him to be a "dirty cop" because he earlier told Fall River Police Chief John Souza that the defendant was among a group of corrupt police officers shaking down drug dealers for money. (Affidavit of Fall River Police Chief John Souza, attached as Exhibit H.) Moreover, when questioned before the Grand Jury, O'Neil admitted that the government suspected, at the time the defendant testified, that the defendant had accepted money and had assisted the Mello crime syndicate. (O'Neil Grand Jury Transcript at 14-15.)

Despite knowing that the defendant was actually a target of the same Grand Jury before which he was subpoenaed, O'Neil assuaged the defendant's apprehension by assuring him he was only a witness. Moreover, O'Neil affirmatively misled the defendant by handing him a subpoena to testify before the Grand Jury marked "witness" without accompanying it with, or following up with, a standard target letter as required by Department of Justice protocol and procedure.

The record clearly demonstrates that O'Neil – who acted as the government's chief investigatory agent despite his status as a local deputy sheriff – and his government cohorts engaged in a pattern of conduct designed to make the defendant believe that he was not a target of the Grand Jury proceedings even after the defendant retained the services of a local attorney. The government told the defendant's attorney, Kenneth

18

Fredette, that "investigators were interested in speaking to [the defendant] regarding information he might have relative to persons targeted." (Fredette Affidavit.) Furthermore, during its meeting with the defendant and Fredette, the government never hinted, stated, or inferred that the defendant was a target of the Mello crime syndicate investigation. Instead, the government agents suggested that the target of the Grand Jury's investigation was not only Timothy Mello but also the defendant's cousin Vincent Schieri. The government compounded its duplicity at this meeting by attempting to enlist the defendant's assistance in delivering a proffer letter to his cousin Schieri. (Id.) By asking the defendant to serve as conduit to obtain Schieri's cooperation, the government clearly intended to imply to the defendant and his attorney that the defendant was part of the team set to dismantle the Mello crime syndicate. As a direct result of the government's assertions and actions, both the defendant and his attorney were wrongfully led to believe that the government regarded the defendant as a fact witness in the Mello crime syndicate investigation. (Id.) The government never took any action to dispel the defendant's or his attorney's misapprehension in this regard; rather the government intentionally perpetuated a misimpression.

When the defendant appeared before the Grand Jury purportedly as a fact witness, the government instead asked him pointed questions about his role in the Mello crime organization. The government's questions, however, clearly revealed that the prosecutors affirmatively viewed the defendant as a target of the investigation. For example, the government asked if the defendant had performed favors for Mello. The government asked whether why the defendant failed to arrest Mello during a raid and declined to charge him with drug trafficking. The government implied to the defendant that he

19

arrested the wrong person during a drug raid in order to allow Mello to escape unpunished. The government asked if the defendant ran license plates for the Mello crime syndicate.

Through its Grand Jury questions, the government revealed that it openly viewed the defendant as a target of the Mello crime syndicate investigation. Moreover, when Mello testified before the Grand Jury two years later, the government asked him the exact same questions it had posed to the defendant when he testified. It is axiomatic that the government prosecutors would not have asked Mello the exact same questions they asked the defendant, and received from him supposedly incriminating answers, unless the defendant was a target in the prior proceeding. Clearly, the government had to have known two years prior to Mello's testimony what Mello would say about the defendant or they never would have asked the defendant such pointed questions during his Grand Jury appearance.

## B. The Government Engaged In Perjury Entrapment

Contrary to its long-established policy, the government never gave the defendant target warnings either before or during the Grand Jury proceedings.[7] Clearly the government attempted to dupe the defendant into testifying in order to try to elicit testimony that the government regarded as perjury. Knowing in advance how the defendant would testify and believing that the defendant would commit perjury, the government tricked the defendant into appearing before the Grand Jury and two years later it indicted him for perjury and obstruction of justice. Deceived into testifying before

---

[7] Kelly did provide the defendant with Miranda warnings and perjury warnings at the outset of the defendant's Grand Jury testimony. The government, however, never supplied the defendant with a standard target warning nor did the prosecution at any time inform the defendant, or his attorney, that he was a target of the investigation.