the Grand Jury, the government trapped the defendant into a perjury indictment. Perjury entrapment occurs when a government agent coaxes a defendant to testify under oath for the sole purpose of eliciting perjury. United States v. Sarihifard, 155 F.3d 301, 308 (4th Cir. 1998). By pursuing a plan of deception and manipulation, the government clearly intended to snare the defendant in a perjury trap.[8] The defendant staunchly maintains that he did not commit perjury when he testified before the Grand Jury on February 7, 2002, but regardless of the question of guilt or innocence, perjury entrapment exists because the government brought the defendant before the Grand Jury only to secure an indictment against him for perjury. Id.

Before and during the Grand Jury proceedings, the government engaged in a series of deceptive acts engineered to camouflage the defendant's true status as an investigatory target. Absent the government's affirmative misrepresentations, the defendant's attorney would not have allowed his client to testify before the Grand Jury. (See Fredette Affidavit at ¶11) ("I would not have allowed Mr. Lafleur to appear and answer questions had we been notified of the true nature of the questioning"). Hence, the government secured the defendant's testimony only through malfeasance. The indictment, therefore, is the product not only of the government's failure to give target warnings; it is the

---

[8] If this case proceeds to trial, the defendant intends to assert the affirmative defense of perjury entrapment. See United States v. Sarihifard, 155 F.3d 301, 308 (4th Cir. 1998). Unlike other forms of entrapment, the affirmative defense of perjury entrapment does in any way constitute an admission that the defendant committed perjury. On the contrary, the defendant maintains his innocence and intends to argue at trial that he did not commit perjury. Perjury entrapment is not inconsistent with this argument. Rather, apart from the question of innocence or guilt, the government engages in perjury entrapment when it entices a defendant to appear before the Grand Jury for the sole purpose of obtaining a perjury indictment. Id.

product of the government's manifestly improper conduct. Accordingly, the court should dismiss the government's tainted indictment.

**C.** **The Government Violated The Defendant's Fifth Amendment Rights When It Impeded The Introduction of Exculpatory Evidence Before The Grand Jury**

The government violated the defendant's due process rights when it silenced two potential Grand Jury witnesses who would have provided information favorable to the accused. While the government generally has no duty to disclose exculpatory evidence to a grand jury, United States v. Wilson, 798 F.2d 509, 517 (1st Cir. 1986), the Fifth Amendment to the United States Constitution imposes an obligation on a prosecutor to disclose substantial evidence negating guilt. See United States v. Bucci, 839 F.2d 825, 831 n. 8 (1st Cir. 1988); United States v. Page, 808 F.2d 723, 727-28 (10th Cir. 1987).

Here, the government not only failed to disclose substantial evidence negating the defendant's guilt, it actually prohibited the introduction of exculpatory evidence. The Grand Jury indicted the defendant based solely on the testimony of two cooperating witnesses. The witnesses were Timothy Mello and Vincent Schieri. Mello and Schieri were two previous targets of the Grand Jury who agreed to testify against the defendant in order to obtain downward departures from their guideline sentencing range pursuant to United States Sentencing Guidelines Manual § 5K1.1. Mello and Schieri testified that the defendant received money from Mello in exchange for protection from arrest. The two cooperating witnesses told the Grand Jury that during one particular drug raid of the home of Joseph Hays in Fall River, the defendant arrested the wrong suspect in order to allow Mello to escape unscathed. The two witnesses also testified that during the same raid, the defendant accepted money from Mello in exchange for releasing him. The

22

defendant, however, testified before the same Grand Jury that he did not in any way assist the Mello crime syndicate. Crediting the testimony of the two cooperators over the defendant, the Grand Jury indicted the defendant on the charge of perjury.

Fall River Police Officers Charles Freitas and Bruce McCabe would have directly refuted Mello's and Schieri's testimony. In fact, the two police officers would have corroborated the defendant's grand jury testimony. Freitas and McCabe accompanied the defendant on the raid where the defendant allegedly allowed Mello to evade arrest. Under oath, the two officers told police investigators that they did not arrest Mello during the raid because he was not connected with the drugs. The officers stated that they arrested the one suspect in the apartment who was physically near the drugs. The officers further stated that the defendant did not arrest the incorrect suspect, and the defendant never accepted a payment from Timothy Mello. During a FRPD internal affairs investigative interview conducted after the defendant's indictment, Officer McCabe told internal affairs that he did not arrest Timothy Mello during the raid in 1992 "[b]ecause there was no proximity to the drugs." (FRPD Internal Affairs Interview of Officer McCabe at 2.) McCabe also denied that he or any other police officer including the defendant ever took money from Timothy Mello. (Id. at 3.) When asked to expound on the government's theory of the case, McCabe replied, "That's the biggest crock of shit I've ever heard in all my 'fuckin' entire life, my fifty-seven years of life. You know, the biggest crock of shit and whoever they are hanging their 'fuckin' hat on, for those kind of 'fuckin' statements, I really and truly don't 'fuckin' know . . . I don't know what their 'fuckin' angle is and how they paint people with a broad 'fuckin' brush or put him in such a 'fuckin' stink or a 'fuckin' you know, its' 'fuckin' absurd. It really and 'fuckin'

truly is. They put a stink on 'fuckin' people . . . For them to allege that 'fuckin' happen (sic) or whoever is feeding them full of 'fuckin' full or 'fuckin' horseshit, you know, it's beyond 'fuckin' belief. It really and truly is." (Id. at 6-7.) The government never called Officer McCabe to testify before the Grand Jury.

The Grand Jury did hear the testimony of Officer Freitas, but the government failed to question him about subjects that would have exculpated the defendant. Officer Freitas told a FRPD internal affairs investigator that he and the defendant did not arrest Mello because they saw Joseph Hays toss the cocaine. Officer Freitas told internal affairs that he informed the government of his version of events just prior to his testimony before the Grand Jury. (FRPD Internal Affairs Interview of Officer Charles Freitas at 3)("Mr. O'Neil ended up somewhat jumping up and making accusations that it is common knowledge that the Fall River Police Department has a lot of dirty cops and my response was I thought he was out of line. He again then – they went back to the report, asking questions concerning Timmy Mello being present at that search warrant and was it true that Timmy Mello was the one that actually threw the coke down, that we saw that take place and that it was Timmy Mello's coke and not Joe Hays' coke. And I said, 'Absolutely not, it was Joe Hays' cocaine.' And it was observed in the apartment, he had made a motion to indicate where it was"). Moreover, Freitas told internal affairs that contrary to Mello's testimony before the Grand Jury, Mello remained silent during the raid in 1992. (Id. at 10.) Freitas also told internal affairs that the defendant's account of the raid in 1992 was essentially accurate. (Id. at 11.) (Lt. Rodrigues: "Is there anything in [the defendant's account of the raid] that would be terribly incorrect?" Off. Freitas: "No.") The government, however, never asked Freitas specific details about the arrest of

Hays and never sought Freitas's opinion on the accuracy of the defendant's prior statements to the Grand Jury. Instead, the government asked obtuse questions designed not to elicit a response regarding the defendant's innocence.

The government's vague questions inside the Grand Jury contrast directly with the targeted questions of the FRPD internal affairs examiner who asked Freitas specifically whether Timothy Mello spoke to the defendant during the 1992 raid. Freitas responded that Mello remained silent during the raid. The internal affairs examiner asked Freitas whether the defendant's version of events was essentially accurate, and Freitas corroborated the defendant's version of events. The internal affairs examiner asked Freitas whether anyone accepted money from Mello during the raid, and Freitas denied the allegation. The government, however, failed to ask such obvious questions because the prosecutors knew that Freitas would have exonerated the defendant. Prior to his testimony before the Grand Jury, Freitas told the government that nothing improper happened during the 1992 raid. (Id. at 3.) The government, therefore, tailored its questioning to avoid potentially exculpatory answers. For example, the government knew that Mello had previously testified that during the raid, he called the defendant over to offer him money. Given the highly unusual nature of a suspect approaching a police officer during a raid, the government should have seized upon this question to corroborate Mello's testimony. Had the government done so, Freitas would have stated, as he told FRPD investigators under oath three months later, that "I don't think at any time during that [1992] search that Mr. Mello even made a statement. I don't believe he said anything at all. He remained quiet the whole time the search (sic)." (FRPD Internal Affairs Interview of Officer Charles Freitas at 10.) The government, however, never

questioned Freitas about this alleged incident because Freitas told them prior to his Grand Jury appearance that nothing improper occurred.

Assistant United States Attorney Samuel Buell ("Buell") did start to question Freitas about the decision not to arrest Mello, but he abruptly withdrew from questions that might elicit exculpatory testimony. Specifically, Buell asked Freitas, "And at the time [of the raid in 1992], did you want to charge everyone involved with a joint venture involving the cocaine?" (Freitas Grand Jury Transcript at 11, attached as Exhibit I.) Freitas responded, "Yes, sir." (Id.) Buell continued, "Okay. And why didn't you; I mean who was charged, I guess I should – who was eventually charged?" (Id.) Freitas responded that the officers charged only Joseph Hays with possession of cocaine. Buell obviously started to ask why the police did not charge Mello, but he suddenly changed the focus of his question regarding the person charged with possession of cocaine and never returned to the crucial question of why the police did not arrest Mello. Buell undoubtedly avoided the question of why the police did not arrest Mello because he feared an answer that might jeopardize his case against the defendant. Again, the government clearly knew that Freitas would have provided exculpatory evidence to the Grand Jury because he told the government his opinion of the events prior to his testimony.

McCabe's and Freitas's testimony would have directly negated the evidence that the defendant lied to the Grand Jury. Moreover, considering that the only evidence of the defendant's guilt is the testimony of two cooperating witnesses, the contrary testimony of two police officers likely would have constituted powerful exculpatory evidence.

26

In preventing the Fall River Police Officers from testifying fully – or testifying at all - before the Grand Jury, the government failed in its duty to disclose substantial evidence negating the defendant's guilt. The government, however, not only failed to introduce substantial exculpatory evidence; it blocked the testimony of witnesses with statements favorable to the accused. The government's transgressions not only constitute a dereliction of its duty to disclose substantial evidence negating guilt, they constitute a severe impingement upon the defendant's Fifth Amendment rights. Such an egregious due process violation mandates the dismissal of the government's corrupt indictment.

## D. Outrageous Governmental Conduct Necessitates A Dismissal Of The Indictment

The court must dismiss an indictment obtained through outrageous governmental conduct. United States v. Marshank, 777 F. Supp. 1507, 1519 (N.D. Cal. 1991). An indictment obtained through outrageous governmental conduct violates a defendant's due process rights. Id. The First Circuit will order the dismissal of an indictment only in cases where "serious and blatant prosecutorial misconduct [exists] that distorts the integrity of the judicial process." Bucci, 839 F.2d at 831; United States v. Ogden, 703 F.2d 629, 636 (1st Cir. 1983).

Here, taken as a whole, the government's prosecutorial misconduct was serious, blatant, and outrageous. At the outset of this investigation, Bristol County Deputy Sheriff Jack O'Neil harassed the defendant's parents by delivering a subpoena to their home despite knowing that the defendant did not live with his parents. (Souza Affidavit.) O'Neil, then, affirmatively misled the defendant into believing he was a witness rather than a target of the government's investigation. O'Neil levied false, slanderous, and

defamatory allegations against the defendant in a private conversation with his Chief, (see Souza Affidavit) which, perhaps, was a deliberate and misguided effort to "turn" the defendant as a witness. The government also tried to recruit the defendant to serve a proffer letter on his cousin, Vincent Schieri, and government agents even suggested that the defendant was an integral part of the government's quest to eradicate the Mello crime syndicate.

When the defendant appeared as a supposed witness before the Grand Jury, neither he nor his attorney had any suspicion that the defendant was an actual target of the government's investigation. When Officer Freitas appeared before the same Grand Jury investigating the defendant, the government failed to allow Freitas an opportunity to exculpate the defendant. The government also failed to summons police officers such as Officer McCabe to testify before the Grand Jury. The government knew that Officer McCabe had exculpatory testimony that would have exonerated the defendant and directly refuted the testimony of the government's two cooperating witnesses. Moreover, the government engaged in perjury entrapment by coaxing the defendant to appear before the Grand Jury for the sole purpose of eliciting perjury. See Sarihifard, 155 F.3d at 308.

The government's repeated mendacity and its deliberate obfuscation of exculpatory testimony constitutes outrageous governmental conduct. The government's prosecutorial misconduct, however, was more than blatant; it was prejudicial to the defendant. Absent the government's misconduct, he would not have testified before the Grand Jury. Absent the government's decision to stifle testimony that would have negated all evidence of guilt, the Grand Jury likely would not have indicted the defendant for perjury.

The severity of the government's misconduct and the prejudicial effect on the defendant compels a dismissal of this indictment. Although the court should use its power to dismiss an indictment for prosecutorial misconduct sparingly, United States v. Busher, 817 F.2d 1409, 1411 (9th Cir. 1987), "sparing use, of course, does not mean no use." Marshank, 777 F. Supp. at 1519 (citations omitted). In this case, principles of fundamental fairness compel a remedy to counteract the government's misconduct. The court, therefore, must exercise its discretion and dismiss the indictment.

## CONCLUSION

For the foregoing reasons, the court should dismiss this unlawfully obtained indictment.

## REQUEST FOR ORAL ARGUMENT

Defendant David Lafleur believes that oral argument will assist the court in resolution of this motion and, therefore, asks the court to schedule an evidentiary hearing on a date convenient to the court and the parties.

Dated: October 5, 2004
Boston, Massachusetts

Respectfully submitted,
DAVID LAFLEUR
By his attorneys,

Jeffrey A. Denner, BBO#120520
Brad Bailey, BBO#549749
Gary G. Pelletier, BBO#631732
DENNER O'MALLEY, LLP
Four Longfellow Place, 35th Floor
Boston, Massachusetts 02114
(617) 227-2800