UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Crim. No. 04-00471-JLT |
| | ) |
| DAVID LAFLEUR | ) |
| | ) |
| | ) |

# DEFENDANT DAVID LAFLEUR'S MEMORANDUM REPLYING TO THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO HIS MOTION TO DISMISS INDICTMENT

On May 13, 2004, a grand jury returned a two-count indictment against Defendant David Lafleur ("the defendant") charging him with one count of perjury and one count of obstruction of justice.  On October 5, 2004, the defendant submitted a motion asking the court to dismiss the government's indictment and grant him an evidentiary hearing.  In his motion, the defendant argues that the government violated his constitutional rights by expressly misleading him into believing that he was not a target of a grand jury's investigation and by deliberately obstructing the introduction of exculpatory evidence before the grand jury.

In its opposition brief, the government erroneously argues that it did not violate the defendant's due process rights because he was not a target of the grand jury's proceedings and that it was unaware of the existence of exculpatory evidence at the time it secured an indictment against the defendant.  Moreover, the government incorrectly argues that regardless how the court views the evidence, its action does not constitute a

Fifth Amendment violation. The government's arguments run contrary to the facts and well-established law.

First, the government's actions toward the defendant clearly demonstrate that it regarded him as a target of the grand jury's investigation. As stated in the defendant's opening brief, the federal courts recognize a distinction between a simple failure to give a witness target warnings and a systematic ruse designed to lure a defendant before a grand jury. Second, although the Fifth Amendment does not require the government to present exculpatory evidence to the grand jury, the government cannot obstruct the introduction of substantial evidence negating guilt. Here, the government not only ignored substantial evidence negating guilt already in its possession, it also ignored additional exculpatory evidence it could have easily obtained and deliberately impeded the introduction of testimony favorable to the defendant during grand jury proceedings.

## STATEMENT OF FACTS

The defendant's opening brief contains a full recitation of the facts in this case. The defendant incorporates by reference herein all facts and arguments contained therein and restates only those facts that are essential to this reply brief.

In 2002, the government conducted an investigation into the Timothy Mello ("Mello") crime syndicate operating in Southeastern Massachusetts. As part of its investigation, the government had Bristol County Deputy Sheriff Jack O'Neil ("O'Neil") deliver a witness subpoena to the defendant. After initially harassing the defendant's family and accosting the defendant's boss (Fall River Police Chief John Souza ("Souza")) with allegations of corruption in his department, O'Neil assured the defendant that the government only wanted to question him as a witness. The government also led the

defendant's attorney, Kenneth Fredette, to believe that his client was a witness who could help dismantle the Mello crime organization. When he appeared before the grand jury, however, the government asked the defendant pointed questions about his "involvement" with Timothy Mello during a raid of the apartment of Joseph Hays ("Hays") that occurred in 1992. Specifically, the government asked the defendant, "Did you ever do any favors for Mello? . . . Did you ever run any license plates for Mello? . . . Did you ever give Mello a heads up that cops are looking at him in various areas?" (Lafleur Grand Jury Transcript, at 13-14, attached to Defendant's Opening Brief as Exhibit C.) The defendant answered "no" to each of these questions. Id.

In the course of its investigation, the government eventually indicted Timothy Mello and the defendant's cousin, Vincent Schieri ("Schieri") on charges of racketeering. Mello and Schieri each pleaded guilty and each agreed to cooperate with the government. As part of their respective cooperation agreements, Mello and Schieri testified against the defendant. The government asked Mello the exact same questions it had asked the defendant two years earlier.

The defendant secured its indictment against the defendant almost wholly based on the testimony of two cooperating criminal witnesses. Despite knowing that Fall River Police Officers would, and could, offer exculpatory testimony, the government chose not to elicit such evidence before the grand jury. The government called only one police officer to testify before the grand jury. The chosen officer was Fall River Police Officer Charles Freitas. Prior to his testimony before the grand jury, Officer Freitas informed the government of his version of what transpired during the 1992 raid of Hays' Fall River apartment. Freitas recounted that just before he testified, Deputy Sheriff "O'Neil ended

up somewhat jumping up and making accusations that it is common knowledge that the Fall River Police Department has a lot of dirty cops and my response was I thought he was out of line. He again then – they went back to the report, asking questions concerning Timmy Mello being present at that search warrant and was it true that Timmy Mello was the one that actually threw the coke down, that we saw that take place and that it was Timmy Mello's coke and not Joe Hays' coke. And I said, 'Absolutely not, it was Joe Hays' cocaine. And it was observed in the apartment, he had made a motion to indicate where it was." (Fall River Police Department Interview of Officer Charles Freitas at 3, attached to Defendant's Opening Brief as Exhibit G).

When Freitas testified before the grand jury, the government sidestepped questions that would have substantially negated evidence of the defendant's guilt. The government asked Freitas whether "at the time [of the raid in 1992], did you want to charge everyone involved with a joint venture involving the cocaine?" (Freitas Grand Jury Transcript at 11, attached to Defendant's Opening Brief as Exhibit I.) Freitas responded, "Yes, sir." (Id.) The government then started to ask Freitas why he did not arrest Mello, but abruptly withdrew the question before he could answer. Specifically, the government initially asked "And why didn't you . . . ." Without pausing, the government shifted gears and said, "I mean who was charged, I guess I should – who was eventually charged?" (Id.) Freitas responded that the officers charged only Hays with possession of the cocaine. (Id.) Because of this deliberate preemption, the grand jury never heard the officer's explanation as to why they did not charge Mello with cocaine possession.

## ARGUMENT

**A.    The Court Should Exercise Its Supervisory Powers and Dismiss the Government's Unlawfully Obtained Indictment**

The government obtained its indictment against the defendant unlawfully and in derogation of his constitutional rights when it affirmatively misled him into believing that he was not a target of the grand jury's investigation. In its opposition brief, the government argues that it did not regard the defendant as a target when he appeared before the grand jury in 2002 and, regardless, the government's trickery does not excuse the defendant's alleged perjury. The facts and the law undercut the government's untenable position.

This case is replete with evidence that the government regarded the defendant as a target of its investigation. Prior to his meeting at the United States Attorney's Office, the government's primary investigator on the Mello crime syndicate case, Bristol County Deputy Sheriff O'Neil, met with Fall River Police Chief John Souza. O'Neil explicitly told Souza that he regarded the defendant as a corrupt cop who assisted Mello with his Southeastern Massachusetts drug operation. Moreover, the government's actions before and during the defendant's grand jury testimony provide ample evidence that it considered the defendant as a target. During the defendant's meeting at the United States Attorney's Office, the government assured the defendant he was part of the team bent on destroying the Mello crime syndicate. The government never asked the defendant questions about his decision not to charge Mello in connection with the raid in 1992 or whether he supplied Mello with information concerning the government's investigation. The meeting instead focused on how the defendant could help thwart Mello and secure the cooperation of the defendant's cousin, Vincent Schieri. The government even

5

suggested that the defendant should deliver a proffer letter to Schieri, who was clearly a grand jury target at the time, and it never hinted that it suspected the defendant engaged in criminal activity.

Once the defendant appeared before the grand jury, the government's tone changed from inquisitive to accusatory. The government asked the defendant "Did you ever do any favors for Mello? . . . Did you ever run any license plates for Mello? . . . Did you ever give Mello a heads up that cops are looking at him in various areas?" (Lafleur Grand Jury Transcript, at 13-14.) The government also asked whether the defendant chose not to arrest Mello during the raid of Joseph Hays' apartment in 1992.

The government's questions unmistakably reveal that it suspected that the defendant was "a dirty cop" tied into the Mello crime organization. The fact that the government camouflaged its suspicions during its pre-grand jury meeting with the defendant and his attorney further underscores that it regarded the defendant as a target. Coupled with Deputy Sheriff O'Neil's statements to Chief Souza, the evidence shows that the government suspected the defendant of criminal wrongdoing. Certainly, the government considered the defendant far more than a witness as it represented to the defendant and his attorney.

Failure to inform a witness that he is a target of a grand jury investigation is a breach of government protocol justifying a dismissal of the indictment. See United States v. Jacobs, 547 F.2d 772, 778 (2d Cir. 1976) (dismissing indictment where the government engaged in an unjustified deviation from its own internal policies). As the First Circuit has held, courts may dismiss an indictment only when the indictment at issue is the product of manifestly improper conduct by government officials. United States v.

Pacheco-Ortiz, 889 F.2d 301, 310 (1st Cir. 1989). Improper conduct occurs when the decision to indict a defendant is "influenced in any manner by the failure to give [target] warnings." Id.

Here, the government not only failed to give target warnings, it affirmatively misrepresented the defendant's status. The government never informed the defendant that it suspected him of criminal involvement with Mello and intentionally set forth to assuage the defendant's fear that he was anything more than a witness. The government not only misinformed the defendant; it deliberately misled the defendant's attorney as to his status.

The government maintains that regardless of the government's actions, a court cannot dismiss an indictment where the defendant engages in perjury. Relying on Pacheco-Ortiz and United States v. Babb, 807 F.2d 272 (1st Cir. 1986), the government implies that a perjury allegation defeats even manifestly improper conduct such as misrepresenting a defendant's status.

The government's argument defies logic. Under the government's theory, its agents could routinely deviate from protocol and lie to defendants and their attorneys with impunity as long as they seek an indictment against the defendant for perjury. The government thereby would create a perjury exception allowing it to engage in blatant misconduct in perjury cases. The perjury allegation would defeat the government's misconduct regardless of how egregious the government's actions. Neither Babb nor Pacheco-Ortiz commands such a nonsensical rule.

While a defendant testifying before a grand jury certainly cannot commit perjury, the government also cannot engage in untoward actions just to secure a perjury

indictment.[1]  The nature of the criminal charge alone cannot defeat an otherwise valid motion to dismiss an indictment.  Rather, regardless of the charge, this circuit has clearly held that a court has the supervisory power to dismiss an indictment where the government engages in manifestly improper conduct and the indictment is the product of the government's failure to give target warnings.  Pacheco-Ortiz, 889 F.2d at 310.  Here, the defendant secured its indictment only through blatant misrepresentations about the defendant's status.  The government's conduct alone compels the use of the court's supervisory power to dismiss the indictment.

**B.**     **The Court Must Dismiss The Indictment Because The Government Intentionally Failed To Present The Grand Jury With Substantial Evidence Negating The Defendant's Guilt**

The government's intentional decision to block the presentation of substantial evidence negating the defendant's guilt warrants a dismissal of the indictment.  In fact, dismissal of the indictment here is the proper remedy here where the government not only failed to disclose evidence negating defendant's guilt, it actually obstructed the introduction of exculpatory evidence.  Relying on the Supreme Court's holding in United

_____

[1] Contrary to the contention in the government's response brief, the defendant is not claiming that the government tricked him into lying before the grand jury.  Rather, the defendant maintains that the government deceived him by assuring him that he was not a target of the grand jury proceedings when in fact the government always intended to secure a perjury indictment.  As stated in his opening brief, the defendant maintains his innocence.  In its opposition brief, the government attempts to cast the defendant's assertion of his innocence as a claim unripe for adjudication until trial.  The government misstates the defendant's position.  The defendant asserts his innocence.  The defendant does not, however, ask the court to adjudicate the question of guilt or innocence in this motion.  The defendant asks the court to use its supervisory power to dismiss an indictment wrought by blatant violations of protocol and the defendant's constitutional rights.  In the context of this motion, the court certainly can adjudicate the question of whether the government improperly secured an indictment against the defendant.

8

<u>States v. Williams</u>, 504 U.S. 36, 51-55 (1992), the government argues that it has no duty to present exculpatory evidence of any kind to the grand jury. The government event accuses defense counsel of violating Massachusetts Rule of Professional Conduct 3.3(a)(3) by failing to disclose the <u>Williams</u> case to this court. The government's ridiculous assertions of professional ethics violations aside, its reliance on <u>Williams</u> is misplaced.

The <u>Williams</u> Court[2], in a five to four decision, rejected without explicitly overruling the Tenth Circuit's reasoning in <u>United States v. Page</u>, 808 F.2d 723 (10th Cir. 1987). See, e.g., <u>United States v. Arnulfo-Sanchez</u>, 2003 WL 21783804, at *42 n.13 (10th Cir. Aug. 4, 2003) ("[W]hen <u>substantial</u> exculpatory evidence is discovered in the course of an investigation, it must be revealed to the grand jury") (citing <u>Page</u>, 808 F.2d at 728) (emphasis in original), <u>cert. denied</u>, 124 S.Ct. 1129 (2004). The <u>Williams</u> Court majority held that the constitution imposes no duty on a prosecutor to present exculpatory

_____

Moreover, the fact that factual disputes exist in this context further buttresses the defendant's request for an evidentiary hearing.

[2] Given the current makeup of the United States Supreme Court, it is questionable whether <u>Williams</u> remains good law. The Court decided <u>Williams</u> in 1992. Justice Scalia wrote the opinion for the Court in which Chief Justice Rehnquist, Justice Kennedy, Justice Souter, and Justice White joined. Justice Scalia's opinion drew a stinging dissent from Justice Stevens joined by Justice O'Connor, Justice Blackmun, and Justice Thomas. Justice Ginsberg later replaced Justice White, and Justice Breyer replaced Justice Blackmun. The Court's current justices present a more than likely possibility that <u>Williams</u> would not survive a constitutional challenge. Moreover, the Court has not explicitly overruled <u>United States v. Page</u>, 808 F.2d 723 (10th Cir. 1987) or <u>United States v. Bucci</u>, 839 F.2d 825 (1st Cir. 1988), which the defendant cites in his opening brief. Indeed, the Tenth Circuit still recognizes Page and the prosecution's duty to disclose substantial exculpatory evidence. <u>United States v. Arnulfo-Sanchez</u>, 2003 WL 21783804, at *42 n.13 (10th Cir. Aug. 4, 2003) ("[W]hen <u>substantial</u> exculpatory evidence is discovered in the course of an investigation, it must be revealed to the grand jury") (citing <u>Page</u>, 808 F.2d at 728) (emphasis in original), <u>cert. denied</u>, 124 S.Ct. 1129 (2004).

evidence to a grand jury even where substantial exculpatory evidence exists. 504 U.S. at 55. Williams, however, is inapposite.

Here, the government not only failed to disclose exculpatory evidence, it affirmatively barred the introduction of substantial evidence negating the defendant's guilt. Even if the failure to present exculpatory evidence is proper, the deliberate scuttling of favorable evidence certainly violates a prosecutor's duty not to intentionally secure an unjust result. See Berger v. United States, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor--indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one").

The government argues that it was (blissfully) unaware of the existence of exculpatory evidence until after the grand jury returned its verdict. The government – which ironically accuses defense counsel of lack of candor to the court – fails to address evidence that disproves its assertion. Fall River Police Officer Charles Freitas maintains that prior to his testimony before the grand jury that indicted the defendant, he informed the government that he and his fellow officers (including the defendant) did not arrest Mello during the 1992 raid of Hays' apartment because Hays alone possessed the drugs.

Specifically, Freitas stated that Deputy Sheriff "O'Neil ended up somewhat jumping up and making accusations that it is common knowledge that the Fall River Police Department has a lot of dirty cops and my response was I thought he was out of line. He again then – they went back to the report, asking questions concerning Timmy Mello being present at that search warrant and was it true that Timmy Mello was the one that actually threw the coke down, that we saw that take place and that it was Timmy Mello's coke and not Joe Hays' coke. And I said, 'Absolutely not, it was Joe Hays' cocaine. And it was observed in the apartment, he had made a motion to indicate where it was." (Fall River Police Department Interview of Officer Charles Freitas at 3).

Knowing that Freitas would likely exculpate the defendant, the government avoided eliciting questions that would undermine its chances of securing an indictment. The transparency of the government actions became evident when Assistant United States Attorney Samuel Buell ("Buell") wove a series of questions designed to prevent the introduction of exculpatory evidence. Buell asked Freitas whether "at the time [of the raid in 1992], did you want to charge everyone involved with a joint venture involving the cocaine?" (Freitas Grand Jury Transcript at 11, attached to Defendant's Opening Brief as Exhibit I.) Freitas responded, "Yes, sir." (Id.) Buell then started to ask Freitas why he did not arrest Mello, but it abruptly withdrew the question. Buell asked "And why didn't you; I mean who was charged, I guess I should -- who was eventually charged?" (Id.) Freitas responded that the officers charged only Joseph Hays with possession of the cocaine. (Id.) Due to the government's obfuscation, the grand jury never heard the officer's explanation as to why the participants in the raid did not charge Mello with cocaine possession. Given the fact that the only witnesses implicating the

11

defendant are two criminal cooperators, Freitas would have provided invaluable and substantial evidence negating the defendant's guilt.

Freitas' pre-grand jury statements certainly put the government on notice as to the existence of additional exculpatory testimony from the other police officers. The government argues that it could not have known about the Fall River Police Department Officers' Internal Affairs testimony without the benefit of a crystal ball. The government did not need to look into a crystal ball to realize that the officers would provide exculpatory testimony; the government needed only to remove its willful blinders. It is well-established that the government cannot turn a blind eye to the existence of exculpatory evidence and has a duty to investigate if provided notice that exculpatory evidence exists within its purview. Kyles v. Whitley, 514 U.S. 419, 437-38 (1995).

Here, Officer Freitas' statements gave the government ample notice that the Fall River Police Officers who accompanied the defendant during the raid in 1992 would relate a version of events far different than the stories told by its two cooperating witnesses. Based upon its obfuscation of the exculpatory facts when Freitas testified before the grand jury, the government, no doubt, was purposefully derelict in its duty to uncover known exculpatory evidence. The government's deliberate dereliction of duty calls for the use of the court's supervisory powers. More significantly, the government's calculated decision to obstruct the introduction of evidence highly favorable to accused is inexcusable and compels the dismissal of this wrongfully obtained indictment.

## CONCLUSION

For the foregoing reasons and the reasons stated in the defendant's opening brief, this Honorable Court must dismiss the indictment.

Dated: November 5, 2004
Boston, Massachusetts

Respectfully submitted,
DAVID LAFLEUR
By his attorneys,

Brad Bailey, BBO#549749
Gary G. Pelletier, BBO#631732
DENNER O'MALLEY, LLP
Four Longfellow Place, 35th Floor
Boston, Massachusetts 02114
(617) 227-2800

13

Certificate of Service

I, Brad Bailey, hereby certify that on November 5, 2004, I provided a true and correct copy of the within Defendant David Lafleur's Memorandum Replying to the Government's Memorandum in Opposition to his Motion to Dismiss Indictment upon Assistant United States Attorney Brian T. Kelly, United States Courthouse, Suite 900, Boston, Massachusetts 02110 by hand delivery.

Brad Bailey