Westlaw.

71 Fed.Appx. 35
71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah))
**(Cite as: 71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah)))**

Page 1

**H**
Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)

United States Court of Appeals,
Tenth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Juan ARNULFO-SANCHEZ, Defendant-Appellant.

Nos. 01-4132, 01-4186.

Aug. 4, 2003.

Defendant was convicted in the United States District Court for the District of Utah for possession of controlled substance with intent to distribute. Defendant appealed. The Court of Appeals, O'Brien, Circuit Judge, held that: (1) officer had reasonable suspicion of criminal activity to detain defendant beyond the time required for valid traffic stop and probable cause to support search of vehicle; (2) failure to submit report of handwriting analyst did not constitute prosecutorial misconduct; and (3) evidence was sufficient to support defendant's conviction.

Affirmed.

West Headnotes
**[1] Automobiles ⚖ 349(17)**
48Ak349(17) Most Cited Cases
**[1] Automobiles ⚖ 349.5(7)**
48Ak349.5(7) Most Cited Cases
Police officer had reasonable suspicion of criminal activity to detain defendant beyond the time required for valid traffic stop and probable cause to support search of vehicle, where officer smelled distinct odor of raw methamphetamine, and defendant and passenger stated that they were en route to family reunion, but they were unable to say exactly where the reunion was being held. U.S.C.A. Const.Amend. 4.
**[2] Criminal Law ⚖ 700(3)**
110k700(3) Most Cited Cases
Failure to submit report of government's handwriting analyst as to diary entries did not constitute prosecutorial misconduct, in drug trafficking prosecution, where report was inconclusive as to whether diary entries were made by defendant, and defense could have called analyst to testify or offered report into evidence.
**[3] Criminal Law ⚖ 700(4)**
110k700(4) Most Cited Cases
Government's alleged failure to disclose impeachment evidence regarding arresting officer, including officer's demotion, information that the officer was defendant in a civil rights action, and a collection of five cases in which defendant during the course of his patrol duties, detected the odor of illegal drugs emanating from a suspect's vehicle, did not constitute *Brady* violation, in drug trafficking prosecution, where defendant had knowledge of all such impeachment evidence prior to trial.
**[4] Controlled Substances ⚖ 81**
96Hk81 Most Cited Cases
Evidence was sufficient to show that defendant had constructive possession of package of methamphetamine found in hidden compartment under floorboard of rear seat of car he was driving, as would support conviction for possession of controlled substance with intent to distribute; although defendant was not registered owner of vehicle, distinct odor of methamphetamine was present in vehicle, the methamphetamine had a retail value of $900,000, so that it would be unlikely that the true owner of substance would leave it in possession of another, defendant could not name the owner of the vehicle, and documents obtained from defendant's day planner were indicative of drug dealing activity. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 21 U.S.C.A. § 841(a)(1).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

71 Fed.Appx. 35
71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah))
(Cite as: 71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah)))

Page 2

**[5] Controlled Substances ⚖=81**
96Hk81 Most Cited Cases
Evidence was sufficient to prove that defendant possessed methamphetamine with intent to deliver, was would support defendant's conviction for possession of controlled substance with intent to distribute; during traffic stop, defendant claimed that he was going to family reunion, but could not articulate a specific destination, defendant could not identify owner of vehicle, dog food was hidden in trunk, from which jury could infer that defendant intended to distract drug dogs, and hidden compartment under floorboard of back seat of car was sophisticated, requiring turn of ignition key, and use of magnet to activate a solenoid, which opened compartment, and magnet was found in car console. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 21 U.S.C.A. § 841(a)(1).

*37 Michael P. Kennedy, U.S. Attorney's Office, Salt Lake City, UT, for Plaintiff-Appellee.

Cheryl J. Sturm, Chadds Ford, PA, for Defendant-Appellant.

Before HARTZ, McKAY and O'BRIEN, Circuit Judges.

**ORDER AND JUDGMENT [FN*]**

FN* This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

O'BRIEN, Circuit Judge.

**1 Juan Arnulfo-Sanchez, along with a codefendant, Robert Escamilla, was convicted by a jury in a joint trial of one count of possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1). He challenges his conviction on three grounds: 1) his Fourth Amendment rights were violated by an unlawful detention and an involuntary consent to search; 2) he was prejudiced by prosecutorial misconduct; and 3) the evidence was insufficient to prove he had constructive possession of the controlled substance. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

STATEMENT OF FACTS

On November 3, 1999, Mr. Sanchez was driving on I 70 with Mr. Escamilla in the passenger seat. A highway patrol trooper stopped the vehicle for two traffic offenses. (ROA, Vol. IV at 4). Upon request from the trooper, Mr. Sanchez produced a valid driver's license, and Mr. Escamilla provided a California vehicle registration showing David Guarcia to be the owner. (ROA, Vol. IV at 5-6). When asked about their travel plans, Mr. Sanchez told the trooper they were en route to Indiana to attend a family reunion, but could not say exactly where the reunion was being held. (ROA, Vol. IV at 7; 41). Mr. Escamilla added that they were to call a family member to confirm where they were headed once they neared Indiana. (ROA, Vol. IV at 7). During this initial encounter, the trooper detected an odor he believed to be indicative of methamphetamine. (ROA, Vol. IV at 5,27,43). The trooper obtained written consent to search the vehicle from both passengers. (ROA, Vol. IV at 8, 54). Following his nose, the trooper traced the scent to the passenger compartment, then to the trunk, and finally to the back seat. The trooper removed the seat, which revealed a hidden compartment under the floorboard where approximately twenty pounds of methamphetamine was discovered wrapped in duct taped packages. [FN2] (ROA, Vol. IV at 8-10). After arresting both Mr. Escamilla and Mr. Sanchez, the trooper conducted a thorough search of the trunk and its contents. In the trunk, the trooper found a gas can, a bag of dog food, and two bags of clothing. (ROA, Vol. V at 8). One of the clothing bags carried a tag bearing Mr. Sanchez's name, and inside that bag was a day planner. (ROA, Vol. V at 8). A search of the passenger compartment revealed another day planner with an airline ticket stub issued in Mr. Escamilla's name. (ROA, Vol. V at 9, 13). Both passengers' wallets were seized. (ROA, Vol. V at 10, 13). Mr. Escamilla was carrying $1,872 in cash along with a small quantity of cocaine. (ROA, Vol IV at 11, 61). Mr. Sanchez was carrying $991 in cash. (ROA, Vol. IV at 11).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

71 Fed.Appx. 35
71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah))
**(Cite as: 71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah)))**

Page 3

> FN2. To access the compartment, the trooper testified he removed the rear seat. Under the seat was an elaborately controlled access panel that opened the hidden compartment. (ROA, Vol.IV, 8-9).

**\*38 I. FOURTH AMENDMENT**

Mr. Sanchez challenges the district court's denial of his motion to suppress the methamphetamine found hidden in the compartment under the rear floorboard, as well as the day planner and its contents, which were found in the trunk. His appeal presents two issues: 1) whether the officer had objectively reasonable and articulable suspicion to justify further detention beyond the scope of the traffic stop; and 2) whether the consent to search the vehicle was voluntary.

**\*\*2** We will uphold the district court's denial of the motion to suppress unless clearly erroneous. *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994), *cert. denied* 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1944) (citations omitted). But, the ultimate determination of reasonableness under the Fourth Amendment is a question of law, which we review de novo. *Id.*

During a routine traffic stop, an officer may request a driver's license and vehicle registration, ask about travel plans and vehicle ownership, and may run a computer check before issuing a citation. *United States v. Williams*, 271 F.3d 1262, 1267-68 (10th Cir.2001), *cert. denied* 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir.2001). Once the driver has produced a valid license and proof that he is entitled to operate the car, further detention and questioning beyond that related to the initial stop is permissible "only if there exists an objectively reasonable and articulable suspicion that criminal activity has occurred or is occurring." *Williams*, 271 F.3d at 1268; *Zubia-Melendez*, 263 F.3d at 1161 (internal quotations and citations omitted).

Mr. Sanchez does not contend the initial traffic stop was improper. Instead, he claims his constitutional rights were violated because the trooper fabricated his justification for the subsequent detention and further questioning. Mr. Sanchez challenges the trooper's testimony that an odor of raw methamphetamine was detectable during the initial encounter. [FN3] As a result, we must determine whether reasonable suspicion existed to support the detention of Mr. Sanchez beyond the time required for the initial stop.

> FN3. He discredits the trooper's testimony that the odor of methamphetamine was readily detectible by pointing out that a trained canine, released at the scene sometime after the arrest and search, but before the drugs were removed from the compartment, did not alert immediately to the presence of drugs. (ROA, Vol.V, 179-83). Instead, the canine alerted only when led to the back seat of the vehicle. (Id. at 183). Mr. Sanchez's argument, while plausible, did not persuade the trial judge or the jury; perhaps because by the time the canine approached the vehicle, the doors were open and the back seat removed, allowing the inference that the odor was no longer concentrated inside the vehicle. (Id. at 180, ln. 17).

[1] Considering all the evidence, the district court believed the trooper's testimony that he detected an odor, which his training and experience indicated was the scent of raw methamphetamine. The trooper testified the odor was "distinct," and he recognized the scent when he first approached the vehicle. **(ROA, Vol. IV at 5).** Even though the odor testimony alone, if credible, could satisfy the threshold test and justify further detention and questioning, the district court also credited the testimony about inconsistent travel plans given by the two defendants, as well as the dubious registration of the vehicle to a person they could not readily identify. [FN4] **\*39** Nothing suggests the district court's finding of reasonable and articulable suspicion was erroneous, so we turn to the question of probable cause to search. [FN5]

> FN4. After handing the registration to the trooper, the Defendants were only able to identify the registered owner as "David." Neither could recall his last name. (Vol. IV at 39, ln. 22).

> FN5. Mr. Sanchez contends that his

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

71 Fed.Appx. 35
71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah))
(Cite as: 71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah)))

Page 4

motion to suppress should have been granted because he did not voluntarily consent to a search of the vehicle. It might be debatable whether continued detention became consensual when Mr. Sanchez signed the consent form, but it is academic. Because we conclude that the detention and the warrantless search were lawful, we do not reach the consent issue.

"An officer has probable cause to search a car if, under totality of circumstances, there is a fair probability the car contains contraband or evidence." *United States v. Parker,* 72 F.3d 1444, 1450 (10th Cir.1995) (internal quotations omitted). The scent of *raw* methamphetamine emanating from vehicle (as was the case here) will suffice to provide probable cause for a search of the entire vehicle, including the trunk. *United States v. Wald,* 216 F.3d 1222, 1228 (10th Cir.2000) (emphasis added). [FN6]

> FN6. The smell of raw or burnt drugs justifies a search of the passenger compartment, but the smell of burnt marijuana does not justify the search of the trunk. *Wald,* 216 F.3d at 1228; *Parker,* 72 F.3d at 1450. In *Wald,* we noted that "the rule is premised on the common sense proposition that the smell of burnt marijuana is indicative of drug usage rather than drug trafficking, and because it is unreasonable to believe people smoke marijuana in the trunks of cars, the mere smell of burnt marijuana does not create the fair probability that the trunk contains marijuana." *Wald,* 216 F.3d at 1226.

\*\*3 Additionally, the factors found to justify the detention and questioning also support a probable cause determination. Still further, after discovering the secret compartment and its contents (twenty pounds of methamphetamine), the trooper had abundant reason to thoroughly search the trunk and its contents, which we note was done post-arrest. There was no Fourth Amendment violation.

II. PROSECUTORIAL MISCONDUCT

At the close of the government's evidence, Mr. Sanchez's counsel moved in open court for a dismissal of the charges as a matter of law, and in the alternative, he renewed a previous objection to discovery violations and asked for a mistrial. (Sanchez Appdx. Vol III., 457). The district court denied the motion to dismiss and reserved ruling on the motion for a new trial. [FN7] (Id. at 467). Mr. Sanchez's trial motions attacked the chain of custody of evidence and accused the government of intentionally delaying discovery of a handwriting analysis report. (Sanchez.Appx.Vol.III, pp. 457-67). After trial, but before the district court ruled on the motion for a new trial, Mr. Sanchez filed a Motion for Judgement of Acquittal pursuant to Fed.R.Crim.P. 29, [FN8] requesting a mistrial and dismissal of the indictment as a sanction for the government's alleged violation of his constitutional rights. (Vol.1, Doc. 158). In support of his motion, he filed a supplemental memoranda containing a plethora of accusations of prosecutorial misconduct. (Id.). At the post-trial hearing on his motion for acquittal, Mr. Sanchez focused only on his claims that the prosecution falsely represented to the defense the availability and substance of a report from the government's handwriting \*40 analyst, and that the government was under an obligation to, but did not, disclose the findings of the report to the jury. [FN9] (Sanchez Vol. XXIII, 8-9). The district court denied his motion for acquittal as well as his pending motion for a new trial, concluding that the government did not misrepresent to the defense or to the court either the availability of the report or its substance. (Id. at 26-28). The district court also discarded Mr. Sanchez's claim that he was prejudiced by the government's choice not to divulge the handwriting report to the jury. (Id.).

> FN7. While the record shows that Mr. Sanchez moved for a mistrial, the district court interpreted the motion to be for a new trial. (Sanchez Appendx Vol. 467).

> FN8. "Rule 29 provides a motion for judgment of acquittal as the substitute for the former motions for a directed verdict and for dismissal." *United States v. Parra,* 2 F.3d 1058, 1069 n. 8 (10th Cir.1993), *cert. denied* 510 U.S. 1026, 114 S.Ct. 639, 126 L.Ed.2d 597 (1993).

> FN9. At his post-trial motion hearing in April 2001, Mr. Sanchez accused the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

71 Fed.Appx. 35                                                                                                               Page 5
71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah))
**(Cite as: 71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah)))**

government of misrepresenting the availability of the report during a pre-trial hearing held on March 12, 2001. In arguing his motion in April, Mr. Sanchez recalled that the government represented on March 12th that the report was "unavailable" at that time, but the report itself indicates it was faxed to the government from the expert on the 12th of March. **(ROA, Vol. XXIII at 7).** Our review of the record proves more conclusive than defense counsel's recollection. On March 12, 2001, two days before trial began, the government represented to the defense that the handwriting analysis report had been received in the government's office that day, but copies had not yet been made. (Sanchez, Vol XIV, 9). The defense agreed to meet at the government's office at five o'clock that evening to get a copy of the report. (Sanchez Vol XIV, 11-13.) We agree with the district court; the government did not misrepresent the availability of the report.

Also at the post-trial motion hearing in April 2001, Mr. Sanchez accused the government of misrepresenting the substance of the report at the pre-trial hearing on March 12, 2001. On March 12th, the government described the report as "inconclusive." **(ROA, Vol. XIV at 13** ). But, Mr. Sanchez argued in April that "inconclusive" was a misrepresentation of the report. The report reads, "... I could find no scientific evidence to support the belief that they [Defendants] wrote any of the questioned writing." **(ROA, Appendix Vol I at 78; Gov.'s Brief at Attch. B)**. The district court concluded the government did not mischaracterize the contents of the report by referring to this language as "inconclusive." We agree.

On appeal, Mr. Sanchez narrows the issues and now argues: 1) by failing to disclose the handwriting report to the jury, the government deliberately misrepresented the truth; and 2) the government intentionally withheld information from the defense that might have been used to impeach the arresting trooper. Nowhere in Mr. Sanchez's briefs on appeal do we find any express reference that he is appealing either the denial of his motion for acquittal or the denial of his motion for a new trial. He simply requests that "[t]he conviction should be reversed, and the case remanded for judgment of acquittal." **(Sanchez Second Corrected Opening Brief at 29).** In any event, the district court did not err.

**\*\*4** Prosecutorial misconduct is not grounds for action under Rule 29. *United States v. Ellison,* 684 F.2d 664, 665 (10th Cir.1982) *vacated on other grounds,* 722 F.2d 595 (10th Cir.1982). "The proper basis for a Rule 29(a) motion for judgment of acquittal is a claim of insufficient evidence in light of the elements of the offense charged." *United States v. Urena,* 27 F.3d 1487, 1490 (10th Cir.1994) *cert. denied,* 513 U.S. 977, 115 S.Ct. 455, 130 L.Ed.2d 364 (1994). Sufficient evidence was presented to sustain Mr. Sanchez's convictions. *(See* discussion *infra* ).

We review the district court's denial of the motion for a new trial for abuse of discretion. Mr. Sanchez argues we should review de novo, ignoring what we have said:
> [W]hen the district court has denied a defendant's motion for a new trial or for a mistrial, the defendant may not ignore this determination and seek de novo appellate review of the court's ruling on defense counsel's prosecutorial misconduct objection. Rather, the proper **\*41** course is for this court to review the denial of defendant's motion [for a mistrial] under an abuse of discretion standard.

*United States v. Gabaldon,* 91 F.3d 91, 94 (10th Cir.1996).

[2] Mr. Sanchez first argues the prosecution was obligated, but failed, to reveal results of a handwriting report to the jury--results he believes exonerate him. In support of his argument, he calls our attention to *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967), where the United States Supreme Court condemned the prosecutor's deliberate choice to refer to vital evidence as stained by blood when the prosecutor knew the stains were actually caused by red paint. *Id.* at 6, 87 S.Ct. 785. Finding such deception a miscarriage of justice, the Court invalidated the defendant's conviction. *Id.* Mr. Sanchez would have us

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

71 Fed.Appx. 35                                                                                         Page 6
71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah))
**(Cite as: 71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah)))**

construe the government's choice not to call its handwriting expert as analogous to the situation in *Miller*. We cannot make that leap. Significantly, the government did not argue to the jury that the report conclusively identified Mr. Sanchez as the author of the incriminating documents. Instead, the government's case relied on other circumstantial evidence to allow the jury to infer that Mr. Sanchez was the author. While the government cannot deliberately present false evidence, the ends of justice do not obligate it to introduce that which is inconclusive or marginal. Mr. Sanchez even concedes that the "[g]overnment's handwriting analysis proved inconclusive. The handwriting analyst could not say with any degree of certainty that the entries in the diary were made by Arnulfo-Sanchez." **(Sanchez Reply Brief at 11)**. Moreover, if the inconclusive report was so significant, as is now claimed, the defense could have called the analyst to testify or offered the report into evidence. [FN10] The record reveals no such attempt.

> FN10. The defense physically received the report on March 13, 2001, the day before trial. But according to the government, the report was ready to be picked up at its office at five o'clock the evening of the 12th of March, as was agreed. (Sanchez, XXIII, 24, 17).

[3] Last, we address Mr. Sanchez's contention that the government improperly failed to provide the defense with information that possibly could have been used to impeach the arresting trooper. The suspect information involves 1) the trooper's demotion from sergeant to trooper under circumstances unrelated to this case; 2) information that the trooper was a defendant in a 42 U.S.C. § 1983 illegal detention case that might reflect poorly on his credibility; [FN11] and 3) a collection of five cases from this Circuit where the trooper, during the course of his patrol duties, detected the odor of illegal drugs emanating from a suspect's vehicle. [FN12] The district court's order denying Mr. Sanchez's motion did not address the issue regarding disclosure of impeachment materials, presumably because it was not discussed at the motion hearing and conceivably abandoned by the defense. (Appl.App.Vol.I, Doc. 52). Regardless, to the extent Mr. Sanchez argues the non-disclosure of impeachment evidence justifies a new trial, nothing in the record suggests the district *42 court abused its discretion in denying the motion *sub silentio*.

> FN11. Mr. Sanchez directs our attention to *Skultin v. Bushnell*, 82 F.Supp.2d 1258 (D.Utah 2000).

> FN12. Mr. Sanchez directs our attention to *United States v. Parker*, 72 F.3d 1444 (10th Cir.1995); *United States v. Nielsen*, 9 F.3d 1487 (10th Cir.1993); *United States v. Dennis*, 113 F.3d 1247 (10th Cir.1997) (unpublished table decision); *United States v. Castine*, 156 F.3d 1244 (10th Cir.1998) (unpublished table decision); *United States v. Anderson*, 172 F.3d 63 (10th Cir.1999) (unpublished table decision).

**\*\*5** The government has an obligation to disclose both exculpatory evidence and evidence that possibly could be used to impeach a government witness. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). [FN13] There is ample evidence that the Defendant was informed prior to trial of all the information he now asserts was concealed from him. During the motion hearing on March 13, 2001, the day before trial, the government specifically called attention to the arresting trooper's demotion, stating that it was understood to have been related to matters of insubordination. (Sanchez XV, 65). At that same hearing, the government also disclosed a number cases involving the arresting trooper, including a citation to *Skultin v. Bushnell*, 82 F.Supp.2d 1258 (D.Utah 2000)--the civil case in which Trooper Bushnell was a defendant. (Sanchez XV, 65-66; Vol. I, Doc. 162, Attachment A). At trial, Mr. Sanchez's attorney cross examined the arresting trooper about his recent demotion. That attempt belies the present claim that the government failed to disclose the information.

> FN13. In *Giglio*, the Supreme Court held that suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution.... When the reliability of a given witness

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

71 Fed.Appx. 35                                                                                                                Page 7
71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah))
**(Cite as: 71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah)))**

may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule. *Id.* at 153-54, 92 S.Ct. 763 (internal quotations and citations omitted). We have held that "the prosecutor is not obliged to ferret out and present every bit of potentially **exculpatory evidence**. But when *substantial* **exculpatory evidence** is discovered in the course of an investigation, it must be revealed to the **grand jury**." *United States v. Page,* 808 F.2d 723, 728 (10th Cir.1987) *cert. denied,* 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987) (emphasis in original). Recognizing its obligation to disclose **exculpatory evidence**, as well as evidence that may be used to impeach a government witness, the government advised the defense on March 13, 2001, of facts it believed to fall within this rule.

Finding no abuse of discretion, we affirm the district's denial of Mr. Sanchez's motion for a new trial.

III. SUFFICIENCY OF THE EVIDENCE

When reviewing a sufficiency of the evidence claim in a criminal case, we view the evidence de novo but in the light most favorable to the government, and apply a single test. The evidence--both direct and circumstantial, together with the reasonable inferences to be drawn therefrom--is sufficient if a reasonable jury could find the defendant guilty beyond a reasonable doubt. *United States v. Jones,* 49 F.3d 628, 631 (10th Cir.1995) (citations omitted), *reh'g denied* (1995); *United States v. Hooks,* 780 F.2d 1526, 1531 (10th Cir.1986) *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986) (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Mr. Sanchez's conviction may rest on a finding of constructive possession. *Jones,* 49 F.3d at 632. Constructive possession is established if a person "knowingly held ownership dominion or control over the object and the premises where the contraband was found." *United States v. Castorena-Jaime,* 285 F.3d 916, 933 (10th Cir.2002) (internal quotations and citations omitted). However, where there is more than one possibility as to who is in possession of the contraband, proof of dominion over the vehicle and proximity to contraband is insufficient; the government must also show a nexus between the defendant and the contraband. *United States v. Hishaw,* 235 F.3d 565, 572 (10th Cir.2000) *cert. denied,* *43533 U.S. 908, 121 S.Ct. 2254, 150 L.Ed.2d 241 (2001) (quoting *United States v. Reece,* 86 F.3d 994, 996 (10th Cir.1996)). "There must be some evidence 'supporting at least a plausible inference that the defendant had knowledge of and access to' " the controlled substance. *Hishaw,* 235 F.3d at 571 (quoting *United States v. Mergerson,* 4 F.3d 337, 349 (5th Cir.1993) *cert. denied,* 510 U.S. 1198, 114 S.Ct. 1310, 127 L.Ed.2d 660 (1994)).

**6 Citing *Reece,* 86 F.3d 994 (10th Cir.1996), Mr. Sanchez argues that the government failed to sufficiently link him to the illegal cargo in any way other than mere presence and proximity. As he does with his arguments regarding reasonable suspicion and probable cause, he questions the credibility of the arresting trooper, and suggests that the jury should not have relied on the trooper's testimony. Further, he questions whether the jury could reasonably infer that he was the author of the incriminating documents found in the vehicle. Last, he argues the government should have, but did not, investigate the culpability of the person to whom the vehicle was registered.

[4] Because the methamphetamine was confined in a hidden compartment under the floorboard of the rear seat of a vehicle that Mr. Sanchez did not own, his mere presence in the vehicle cannot by itself sustain the jury's finding that he knowingly possessed a controlled substance. *Hooks,* 780 F.2d at 1531. Likewise, because the government did not establish that he was familiar with the smell of methamphetamine, the mere presence of the odor in the vehicle does not, by itself, establish that he knew methamphetamine was concealed in the car. *Id.* But other circumstantial evidence was presented to the jury.

Testimony established that the arresting officer, utilizing his training and experience, detected the "very distinct" odor of methamphetamine at the moment he approached the vehicle. **(ROA, Vol. IV at 5).** Another officer also testified that he could

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

71 Fed.Appx. 35  
71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah))  
**(Cite as: 71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah)))**

Page 8

smell the odor from inside the vehicle. (V, 191). The jury heard testimony that a trained canine alerted when it made its way to the back of the vehicle. (V, 183). From these facts, a jury could reasonably infer that as the driver of the vehicle, Mr. Sanchez would have had to endure this odor whether or not he could have identified it. [FN14] That might be sufficient to alert a reasonable person that something was amiss, but there is more evidence, discussed below, to support the jury's conclusion that Mr. Sanchez knew he was transporting methamphetamine.

> FN14. Mr. Sanchez believes the jury relied on the trooper's testimony even though incredible. The law is clear that in reviewing the evidence, we do not weigh conflicting evidence or consider witness credibility, as that duty is delegated exclusively to the jury. *United States v. Sanders*, 240 F.3d 1279, 1281 (10th Cir.2001).

First, the jury was informed that the value of twenty pounds of methamphetamine might reach a wholesale price of $150,000 or retail at $900,000. The high value of controlled substances may be used to infer constructive possession based on the logic that it is unlikely that the true owner of the vehicle or the substance would leave such a valuable commodity unattended or in possession of a stranger, "especially a substance whose odor clearly revealed its location." *Hooks*, 780 F.2d at 1532; *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir.1999). Additionally, there was testimony that Mr. Sanchez was unable to name the owner of the vehicle he was driving.

Second, the jury heard testimony generally describing "pay-owe sheets," i.e., slips of paper where drug deals are documented *44 with names, amounts of money paid and owed, and the amount of drugs distributed. It also heard that evidence retrieved from Mr. Sanchez's day planner resembled pay-owe sheets. [FN15] For instance, Government's Exhibit 3A, which is a piece of a paper identical to those in Mr. Sanchez's day planner, reflects handwritten notations of names and numbers, e.g., "Boby 1000" and "John 4000." Mr. Sanchez contends that even if the documents obtained from his day planner are indicative of drug activity, the government failed to present evidence sufficient to allow a jury to infer that he was the author. We disagree. The trooper found one day planner in the trunk of the car inside a bag that was tagged with Mr. Sanchez's name and Tucson address. (vol. V at 8, 13). Mr. Sanchez's wallet contained a handwritten tag with his name and California address. (vol.V,13). From the perspective most favorable to the government, it is reasonable for the jury to have concluded the sheets were authored by Mr. Sanchez and were pay-owe sheets.

> FN15. An agent for the Drug Enforcement Agency testified as to what professionals in his field refer to as pay-owe sheets. Contrary to Mr. Sanchez's argument, the agent was not asked to and did not give his opinion as to whether the exhibits offered by the government were indeed pay-owe sheets. That conclusion was appropriately left in the jury's province. We find no merit to Mr. Sanchez's position that the jury inappropriately considered the agent's testimony. (Sanchez Vol. XIX, 105-108, App't Br. at 21).

**\*\*7** [5] Last, several tangential facts could support the jury's conclusion that Mr. Sanchez possessed methamphetamine with intent to deliver. Some are innocent considered in isolation but part of a damning mosaic when considered in context. Mr. Sanchez claimed he was traveling to Indiana to attend a family reunion but was unable to articulate a specific destination, which may suggest falsification of travel plans. Neither he nor Mr. Escamilla could reasonably identify the owner of the vehicle. Dog food hidden in the trunk of the car, without any evidence that either passenger owned a dog, may indicate the hope of distracting a dog trained to detect illicit drugs. A gas can also found in the trunk of the car could evidence knowledge that the car's gas tank had been altered to a diminished capacity in order to hold and conceal drugs. Last, the jury watched a video tape, recorded as a training video for the highway patrol, which documented the sophistication of this particular hidden compartment. (Gov. Exhibit 4). To access the secret compartment, it was necessary to turn on the ignition key and the lights so as to enable a magnetic switch hidden in the console.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

71 Fed.Appx. 35
71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah))
**(Cite as: 71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah)))**

Page 9

(Vol.IV, 16). To open the compartment, it was necessary to pass a magnet, which was found in the console, over a certain point inside the console. (Id.). The magnetic "key" activated a solenoid, which opened the door to the compartment. (Exhibit 4). The compartment was created by altering the gas tank, which is located under the back seat. (Exhibit 4). From the ready availability of an object as uncommon as a magnet--in effect a key to the compartment--a reasonable jury could infer knowledge of the secret compartment, as well as its contents. [FN16] The evidence presented to the jury was sufficient to support Mr. Sanchez's conviction.

> FN16. If Mr. Sanchez had been duped into transporting drugs, as his arguments suggest, it is unlikely the owner of illegal drugs worth nearly a million dollars would leave a magnetic "key" in the vehicle allowing access to the drugs by virtual strangers.

Accordingly, the findings and holdings of the district court are AFFIRMED.

71 Fed.Appx. 35, 2003 WL 21783804 (10th Cir.(Utah))

Briefs and Other Related Documents (Back to top)

• 2004 WL 1079839 (Appellate Brief) Appellant's Second Corrected Opening Brief (Mar. 08, 2004)Original Image of this Document (PDF)

• 2002 WL 32502311 (Appellate Brief) Appellant's Reply Brief (May. 06, 2002)Original Image of this Document (PDF)

• 2002 WL 32502424 (Appellate Brief) Brief for the United States (Apr. 29, 2002)Original Image of this Document (PDF)

• 01-4186 (Docket)
(Sep. 19, 2001)

• 01-4132 (Docket)
(Jul. 11, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Attached Printing Summary Report for PELLETIER,GARY 4653060**

| | |
|---|---|
| Your Search: | ("EXCULPATORY" /1 "EVIDENCE") /P ("GRAND" /1 "JURY") |
| Date/Time of Request: | Thursday, November 04, 2004 15:54:00 Central |
| Client Identifier: | LAFLEUR |
| Database: | ALLFEDS |
| Citation Text: | 286 F.3d 767 |
| Lines: | 754 |
| Documents: | 1 |
| Images: | 0 |

(C) 2004. Copyright is not claimed as to any part of the original work prepared by a U.S. government officer or employee as part of that person's official duties. All rights reserved. No part of a Westlaw transmission may be copied, downloaded, stored in a retrieval system, further transmitted or otherwise reproduced, stored, disseminated, transferred or used, in any form or by any means, except as permitted in the Westlaw Subscriber Agreement, the Additional Terms Governing Internet Access to Westlaw or by West's prior written agreement. Each reproduction of any part of a Westlaw transmission must contain notice of West's copyright as follows: "Copr. (C) 2004 West, a Thomson business. No claim to orig. U.S. govt. works." Registered in U.S. Patent and Trademark Office and used herein under license: KeyCite, Westlaw and WIN. WIN Natural Language is protected by U.S. Patent Nos. 5,265,065, 5,418,948 and 5,488,725.